T.C. Memo. 1997-22

UNITED STATES TAX COURT

DANIEL C. NOONAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6722-95.                     Filed January 14, 1997.

Daniel C. Noonan, pro se.

<u>Gregory Powers</u>, for respondent.

MEMORANDUM OPINION

NAMEROFF, <u>Special Trial Judge</u>:  This case was heard pursuant
to the provisions of section 7443A(b)(3)[1] and Rules 180, 181, and
182.  Respondent determined a deficiency in petitioner's 1988

--------

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year at issue.  All
Rule references are to the Tax Court Rules of Practice and
Procedure.

Federal income tax in the amount of $3,162, plus an addition to tax under section 6651(a)(1) in the amount of $791.

The issues for decision are: (1) Whether petitioner is entitled to joint filing status, and (2) whether petitioner is liable for the addition to tax under section 6651(a)(1) for failure to timely file his return.

Some of the facts have been stipulated, and they are so found. The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. At the time of the filing of the petition, petitioner resided in Thousand Oaks, California.

Petitioner and Melissa Noonan (Mrs. Noonan) were married in 1973 and have 4 children. From 1973 through 1985, petitioner and Mrs. Noonan filed joint Federal income tax returns.

In May 1987, petitioner and Mrs. Noonan separated. Sometime in 1987, Mrs. Noonan commenced judicial proceedings for divorce. During 1988, Mrs. Noonan and the children resided with Mrs. Noonan's father. Petitioner and Mrs. Noonan did not reside together at any time during 1988.[2] After a long and bitter proceeding, the divorce between petitioner and Mrs. Noonan became final in 1991.

---

[2] However, there is no indication in the record that they were legally separated during 1988 under a decree of separate maintenance. See sec. 6013(d)(2).

On or about April 15, 1989, petitioner filed for an extension to file the 1988 Federal income tax return together with a payment of $469. On the extension form, petitioner indicated that he would claim joint filing status.

On October 5, 1990, after substantial negotiation, petitioner and Mrs. Noonan signed an Indemnification and Hold Harmless Agreement (the indemnification agreement). The indemnification agreement recited that the Noonans had not filed tax returns for the years 1986, 1987, and 1989, and that they agreed to file joint tax returns for 1986 and 1987 reflecting refunds due. According to the indemnification agreement, petitioner agreed to accept sole financial responsibility for all taxes, interest, and penalties connected with the 1988 Federal return in exchange for Mrs. Noonan's agreement to sign a 1988 Federal tax return claiming joint filing status. Petitioner and Mrs. Noonan further agreed that a 1988 California State income tax return (the California return) would be filed after execution of the indemnification agreement, but that a 1988 Federal return would not be filed at that time because petitioner was financially unable to pay the indicated liability. Petitioner and Mrs. Noonan further agreed that Mrs. Noonan would sign a completed 1988 joint Federal return which would be retained by Hill, Farrer, & Burrill (the law firm) until petitioner notified the law firm that he was able to pay the entire tax liability.

According to the indemnification agreement, when the law firm received money to pay the tax liability, it would then mail the completed and executed 1988 Federal return to the Internal Revenue Service (IRS).

When Mrs. Noonan signed the indemnification agreement, she intended to file a joint 1988 Federal return provided petitioner paid all the tax liabilities associated with taxable year 1988. She would not have signed the indemnification agreement without petitioner's agreement to pay the tax liabilities for 1988.

When petitioner and Mrs. Noonan signed the indemnification agreement, Ron Pearson (Mr. Pearson) at the law firm was Mrs. Noonan's tax counsel. After the indemnification agreement was signed, petitioner provided Mr. Pearson with a completed 1988 Federal return. Mr. Pearson reviewed the completed 1988 Federal return and supporting documentation with Mrs. Noonan. Petitioner and Mrs. Noonan signed the completed 1988 Federal return, and it was retained by the law firm. Sometime in 1990, Mr. Pearson left the law firm and gave the completed and executed 1988 Federal return to Mrs. Noonan's father, who was an attorney of counsel to the law firm.

On October 26, 1990, the joint California return was filed with the Franchise Tax Board in Sacramento, California. The California return was signed by petitioner and Mrs. Noonan. A

copy of the signed joint Federal return was filed with the California return.

Petitioner anticipated receiving a distribution of funds from the divorce proceeding with which he would pay the indicated tax liability for 1988. He confirmed this intention in letters to Mr. Pearson (with copies to his ex-wife) dated April 2, 1991 and August 22, 1991.[3] On February 15, 1992, he wrote to Mrs. Noonan as follows:

> Now that the distribution of property is complete, I am again notifying you that I am prepared to file the 1988 Federal tax return. As you know, Ron Pearson gave you the original some time last year which he confirmed to me over the phone.
>
> Let's get this finalized. Let me know when we can do this.

On March 3, 1992, he again wrote to Mrs. Noonan as follows:

> Since you continue to tell me that you cannot locate the 1988 Federal tax return, I must ask that you do everything in your power to locate it. It is important to get this filed and behind us.
>
> Please let me know when you find it or if there is anything I can do to move this along.

Petitioner also testified that he telephoned Mrs. Noonan and unsuccessfully requested the completed and executed 1988 Federal return so he could file it. Petitioner never provided the law firm or Mrs. Noonan with the funds to cover the 1988 tax liability.

---

[3] On June 24, 1991, petitioner received a letter from the IRS indicating that he was subject to backup withholding in connection with the failure to file a 1988 Federal return.

According to petitioner, he filed a 1988 Federal return in March 1992 without payment of the tax liability shown thereon. Petitioner has no proof of mailing to show that he filed a 1988 Federal return at that time. The IRS has no record of receipt of that return from petitioner.

In 1992, Carla Burton (Ms. Burton), a revenue officer at the Oxnard district office, began a taxpayer delinquency investigation to secure a 1988 Federal income tax return from petitioner. According to Ms. Burton, if there is no return on file, the usual procedure is to request an original return from the taxpayer. If the return subsequently submitted by the taxpayer is complete, the information appears accurate, and there are original signatures on the return, the usual procedure is to process the return by forwarding it to the teller function of the IRS. If the taxpayer advises her that a return has been filed, she would then request a copy of the return so that she could examine the return to determine if there is a mistake, such as a discrepancy in the Social Security number, on the return. The copy would not be processed because it would not contain original signatures. Ms. Burton typically documents in her notes whether she received an original return from the taxpayer.

Ms. Burton attempted to secure the return from petitioner, rather than Mrs. Noonan, because his address was contained in her records. On May 20, 1992, Ms. Burton went to petitioner's

residence to secure a 1988 Federal return.  Petitioner was not at the residence, so Ms. Burton left a calling card instructing petitioner to telephone her the next day.  On May 21, 1992, petitioner telephoned Ms. Burton and agreed to send a 1988 Federal return to her.  According to Ms. Burton's investigation notes, on May 27, 1992, Ms. Burton received a 1988 Federal return from petitioner.  That return (the May return) contained petitioner's original signature and a copy of Mrs. Noonan's signature.

On May 28, 1992, petitioner advised Ms. Burton to obtain Mrs. Noonan's original signature on the May return, and on June 1, 1992, Ms. Burton mailed a letter and copy of the May return to Mrs. Noonan.  In the letter, Ms. Burton advised Mrs. Noonan of the delinquency and missing 1988 Federal return.  Ms. Burton also requested Mrs. Noonan's signature on the copy of the May return.

On June 4, 1992, Mrs. Noonan telephoned Ms. Burton and told her that she did not want to sign the 1988 return submitted by petitioner because she did not know if the information on the return was correct and because she did not want to incur any liability related to that return.  Mrs. Noonan also informed Ms. Burton that she received no income in 1988.  Mrs. Noonan did inquire at that time as to the status of the joint refunds for 1986 and 1987.  During their conversation, Ms. Burton allegedly advised Mrs. Noonan to file a separate return even though she had

no income in 1988. Mrs. Noonan testified that if she had known that petitioner had paid all tax liabilities related to taxable year 1988, she would have signed the 1988 Federal return submitted by petitioner.

On June 9, 1992, Ms. Burton mailed a letter to petitioner advising him that she was unable to obtain Mrs. Noonan's signature and that he should file a 1988 Federal return as head of household or married filing separate. Ms. Burton did not file the May return for the Noonans.

On June 12, 1992, Ms. Burton mailed Mrs. Noonan a Form 1040 for taxable year 1988. Prior to mailing the Form 1040, Ms. Burton filled in the following information: Mrs. Noonan's name and address, her Social Security number, and zero gross income. Mrs. Noonan completed the Form 1040 and returned it to the IRS. Mrs. Noonan's 1988 Federal return was received by the IRS on July 1, 1992. On the return, Mrs. Noonan reported no income, claimed one exemption, and claimed married filing separate status.

On November 19, 1992, petitioner received a letter from the IRS indicating that a 1988 Federal return had not been filed by him. On January 3, 1993, petitioner filed another copy of the 1988 Federal return (the January return) reflecting his original signature and a copy of the signature of Mrs. Noonan. The tax shown thereon was paid. The original Form 1040 prepared in conjunction with the indemnification agreement and retained by

the law firm, the May return, and the January return are identical in content. All three reflect the claiming of joint filing status as well as an exemption for Mrs. Noonan, in addition to those for petitioner and the four children. The parties have stipulated that the May and January returns each have the original signature of petitioner and a copy of Mrs. Noonan's signature.

In February 1993, petitioner received notification from the IRS that the January return had been received. According to this letter, petitioner had claimed an incorrect amount as estimated tax payment credits and still owed an additional amount due to additions to tax for failure to timely file and pay estimated tax and interest. Between June 7, 1993, and May 23, 1994, a refund from Mrs. Noonan's 1992 Federal income tax return and additional amounts from petitioner's and Mrs. Noonan's separate 1993 Federal returns were used to satisfy assessed additions to tax and interest for 1988. On November 21, 1994, petitioner received a letter from the IRS indicating that all taxes, additions to tax, and interest for the 1988 taxable year had been paid.

Filing Status

A husband and wife may file a joint return. Sec. 6013. A joint return generally must be signed by both spouses. Sec. 1.6013-1(a)(2), Income Tax Regs. However, we have held that a return may be a joint return even though the signature of one

spouse is missing, if both spouses intended to file a joint return.  Estate of Campbell v. Commissioner, 56 T.C. 1, 12-14 (1971); Federbush v. Commissioner, 34 T.C. 740, 754-758 (1960), affd. 325 F.2d 1 (2d Cir. 1963); Hoyle v. Commissioner, T.C. Memo. 1994-592.  Therefore, the resolution of this issue depends upon whether Mrs. Noonan intended that the 1988 return filed by petitioner constitute their joint return.[4]

It is clear that Mrs. Noonan, at all times up until sometime in 1992 at the earliest, intended to file a joint Federal return with petitioner for 1988.  It was so agreed in the indemnification agreement, the joint return was prepared and signed by Mrs. Noonan, and a copy was filed with the joint California return.  Petitioner had attempted to get the law firm or Mrs. Noonan to file the return when he was financially able, but was unsuccessful in getting any cooperation.

Petitioner insists that Mrs. Noonan was uncooperative in locating the completed and executed 1988 return and that she refused to sign the May return (or submit the original 1988 return) due to their bitter divorce.  We have previously held

---

[4]  We do not consider sec. 6013(b) to affect this issue. There does not seem to be any valid reason why Ms. Burton was unable to file the May return; respondent had no difficulty filing the identical January return.  Mrs. Noonan was not obligated to file a 1988 return, and the document she submitted reflected nothing--no income, liability, withholding, nor credits.  Nevertheless, if relevant to consideration of this issue, we deem the May return to have been petitioner's return, and therefore sec. 6013(b)(2) does not control.

that a spouse's refusal to sign a joint return, for reasons unrelated to the return, does not preclude the return from qualifying as a joint return.  Federbush v. Commissioner, supra. Moreover, Mrs. Noonan allegedly refused to sign the May return she had received from Ms. Burton because of her belief that the return might contain inaccuracies.  This excuse is not convincing in that she could have easily compared it to the original in her father's possession and observed that it was exactly the same. Her other excuse, that she did not want to be held liable for any deficiencies relating to the return, is equally not convincing in that she has an adequate remedy in contract law, should it become necessary.  We think that her effort to file a separate return when she was not liable to do so was an effort (with or without Ms. Burton's cooperation and advice) to frustrate petitioner's attempt to file the joint return pursuant to their prior agreement.  Her testimony to the contrary was unpersuasive.

We must, however, consider the effect of the requirement in the indemnification agreement that petitioner submit funds to the law firm to cover the tax liability before the law firm would be responsible for filing the return.  This is a "condition precedent" under contract law and failure to comply therewith usually voids the contract obligation.[5]

---

[5]  In California, a property settlement agreement is a contract, and the rules of contract law apply in its
(continued...)

In contract law, a tender is an offer of performance.  The tender, when properly made, has the effect of placing the other party in default if he refuses to accept it, and the party making the tender may rescind, or sue for breach of contract or for specific performance, where this remedy is available.  The tender must be for full performance at a proper time and place.  It must be timely, unconditional, and in good faith.  If the contract calls for the delivery of some specific thing, actual production of it at the time of tender is not necessary.  Cal. Civ. Proc. Code sec. 1496 (West 1982).  The party must merely be able to produce it and must do so when the offer is accepted.  An offer in writing to pay money or to deliver a written instrument or specific personal property is, if unaccepted, equivalent to actual production.  Cal. Civ. Proc. Code sec. 2074 (West 1983).  Finally, the person to whom tender is made must specify any objections he may have at the time or defects in form or method are waived.  Cal. Civ. Proc. Code sec. 2076 (West 1983).  See generally, 1 Witkin, Summary of Cal. Law, Contracts, secs. 714, 716, and 717, (9th ed. 1987).

In the instant case, petitioner did everything possible he could do short of placing the money for the tax liability in Mrs.

---

[5](...continued)
interpretation and enforcement.  Cal. Civ. Proc. Code sec. 1635 (West 1985); In re Marriage of Benjamins, 26 Cal. App. 4th 423 (1994).

Noonan's hands, which, in view of their animosity toward each other, would not have been a reasonable thing to do.  Mr. Pearson was no longer at the law firm, and payment to the law firm would not be reasonable, inasmuch as the original 1988 tax return was no longer at the law firm.  Petitioner had to deal with Mrs. Noonan.  He wrote to her, advised that he was ready and able to pay the tax (which he was), and requested the return.  Apparently, she first stated she could not find it and then refused to turn it over.  Under these circumstances, petitioner complied with the terms of the indemnification agreement.  His tender (offer to pay the tax) was unreasonably rejected, and, therefore, the condition precedent has been satisfied.

Accordingly, we need not consider whether to attribute to Mrs. Noonan an intent to file jointly based upon the inclusion of her share of community income in the return submitted by petitioner, where de minimis community income may have been included in the return.  See Januschke v. Commissioner, 48 T.C. 496 (1967); Heim v. Commissioner, 27 T.C. 270 (1956), affd. 251 F.2d 44 (8th Cir. 1958).

Based on the record, we conclude that Mrs. Noonan intended to file a joint return with petitioner for 1988.  Thus, petitioner is entitled to joint filing status for 1988.[6]

<u>Decision will be entered</u>

<u>for petitioner</u>.

---

[6]  In view of our conclusion on the first issue, the sec. 6651 issue is moot and requires no further discussion.